UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

UNITED STATES OF AMERICA          :
                                  :
        v.                        :          No. 5:22-cr-00033
                                  :
JOSEPH RAYMOND BERGER (1) and     :
JOSEPH PAUL BERGER (2)            :

_____

**O P I N I O N**
**Defendants' Motion to Dismiss Indictment, ECF Nos. 87, 96 – Denied**

**Joseph F. Leeson, Jr.**                                    **February 5, 2024**
**United States District Judge**


I.      **INTRODUCTION**

The grand jury indicted the defendants, Joseph Raymond Berger ("JR Berger") and

Joseph Paul Berger ("JP Berger"), with one count of unlawful possession of a machinegun in

violation of 18 U.S.C. § 922(o), one count of unlawful possession of a non-registered firearm

(machinegun) in violation of 26 U.S.C. §§ 5845(a)(6), 5861(d), 5871, and one count of unlawful

possession of a non-registered firearm (suppressor) in violation of 26 U.S.C. §§ 5845(a)(7),

5861(d), 5871. *See* ECF No. 1. The Indictment alleges that the defendants unlawfully possessed

thirteen machineguns, as defined by 18 U.S.C. § 921(a)(23) and 26 U.S.C. § 5845(b), and twelve

silencers, as defined by 26 U.S.C. § 5845(a)(7), which were not registered to them in the

National Firearms Registration and Transfer Record ("NFRTR"), as required by 26 U.S.C. §

5841. *See* Indict. at 1–5.

The defendants have moved to dismiss the Indictment.[1] In their Motion, the defendants neither argue that the Indictment is deficient, nor challenge the facts alleged in the Indictment. Instead, they contend that the Court must dismiss the Indictment because their prosecution under all three counts of the Indictment violates their Second Amendment rights to keep and bear arms. For the reasons set forth below, the Motion to Dismiss Indictment is denied.

## II.   DISCUSSION

### A.   <u>As Applied-Challenge to the Machinegun Charges in Counts One and Two of the Indictment</u>

#### 1.   The Statutes at Issue

The defendants contend that the Court should dismiss the machinegun-related charges in Counts One and Two of the Indictment because they are unconstitutional as applied to them under the Second Amendment. Count One pertains to an alleged violation of Section 922(o) of the Criminal Code, which states:

> (o)(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
>
> (2) This subsection does not apply with respect to--
>
> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
>
> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

---

[1]    JR Berger joined in JP Berger's Motion to Dismiss Indictment. *See* Notice of Joinder, ECF No. 96.

18 U.S.C. § 922(o). The term "machinegun" in Section 922(o) "has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. [§] 5845(b))." *Id.* § 921(a)(23) (amended June 25, 2022).[2]

Section 5845(b) of the National Firearms Act ("NFA") defines a "machinegun" as:

any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).

As for Count Two, it relates to the defendants' alleged failure to properly register the machineguns in the NFRTR, as required by the NFA. *See* Indict. at 3–4. Section 5861(d) of the NFA provides that "[i]t shall be unlawful for any person . . . (d) to receive or possess a firearm which is not registered to [them] in the [NFRTR]." 26 U.S.C. § 5861(d). The term "firearm" in Section 5861(d) is defined as:

(1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); *(6) a machinegun*; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device. The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

---

[2]     This amendment moved the definition of "machinegun" to subsection (a)(24).

*Id.* § 5845(a) (emphasis added). The term "machinegun" in Section 5845(a) is defined under

Section 5845(b) as explained above. *See id.* § 5845(b) (defining "machinegun").

### 2.    Analysis: As-Applied Challenge

The Second Amendment states, "[a] well regulated Militia, being necessary to the

security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

U.S. Const. amend. II. "When the Second Amendment's plain text covers an individual's

conduct, the Constitution presumptively protects that conduct." *New York State Rifle & Pistol*

*Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). If the Government wishes to regulate conduct that is

protected by the plain text of the Second Amendment, then it must "justify its regulation by

demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

Pursuant to *Bruen*, the Court applies a two-step analytical framework in determining whether a

statute is unconstitutional under the Second Amendment as applied to a particular defendant,

analyzing: (1) "whether the text of the Second Amendment applies to the person and [their]

proposed conduct," and (2) if the Second Amendment is applicable, whether the Government,

bearing the burden of proof, has justified applying the challenged regulation to the defendant by

"affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits

the outer bounds of the right to keep and bear arms." *Range v. Att'y Gen. United States*, 69 F.4th

96, 101 (3d Cir. 2023) (quoting *Bruen*, 597 U.S. at 19).

Before conducting a *Bruen*/*Range* analysis of the Second Amendment challenge in this

case, the Court must preliminarily address an important dispute about the structure of this

analysis. In the Government's opposition to the Motion to Dismiss, it asserts that when analyzing

whether the Second Amendment covers the conduct regulated by the challenged regulation, "the

Court must assess whether the defendant is part of the people whom the Second Amendment

protects, ***whether the weapon at issue is an arm that is in common use today for self-defense***, and whether the proposed course of conduct falls within the Second Amendment." Gov't's Resp. in Opp'n to Def.'s Mot. to Suppress ("Gov't Opp'n") at 6, ECF No. 98 (emphasis added). The Government then proceeds to argue that the Second Amendment does not apply to the machineguns at issue because they are not "Arms" in common use today for self-defense. *See id.* at 6–15. Essentially, the Government's contention is based on the defendants' Motion failing at step one of the *Bruen*/*Range* analysis. *See id.* at 12 ("The defendant's [sic] argument fails on the first prong of the *Bruen* analysis.").

JP Berger replies to this contention by arguing that the Government's focus on whether machineguns are protected under step one of the *Bruen* analysis is improper because the Government is "conflat[ing]" the two steps of the analysis. *See* Reply in Supp. of Mot. to Dismiss Indict. ("JP's Reply") at 1–5, ECF No. 99.[3] He contends that *Bruen* dictates that, at the first step, the Court must examine the plain text of the Second Amendment, which "does not limit 'arms' to those that are in common use . . . [or] to those that are not dangerous and unusual." *Id.* at 2. He justifies this assertion by pointing out that "[i]n the late 18th century, the term 'arms' included 'all firearms,' as well as 'instruments of offence generally made use of in war,' as well as 'weapons that were not specifically designed for military use and were not employed in a military capacity.'" *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 581–82 (2008)). Based on this history, he argues that "any restrictions on the word 'arms' that is [sic] not contained in the plain text of the Second Amendment should not be analyzed at step one but at step two of the Second Amendment analysis." *Id.* at 4.

---

[3]     The defendants separately filed reply briefs in response to the Government's opposition to their Motion to Dismiss. *See* ECF Nos. 99, 100. JP Berger joined in JR Berger's reply brief. *See* ECF No. 105.

Given these competing arguments, the Court must first address whether determining if a weapon is "'in common use' today for self-defense," *Bruen*, 597 U.S. at 32 (citing *Heller*, 554 U.S. at 627), falls under step one or step two of *Bruen's* Second Amendment analysis. Unfortunately, "[t]here is no consensus on whether the common-use issue belongs at *Bruen* step one or *Bruen* step two." *Bevis v. City of Naperville*, 85 F.4th 1175, 1198 (7th Cir. 2023).

The initial confusion over the location of the common-use issue in *Bruen's* Second Amendment analysis undoubtedly arises from *Bruen* itself. In *Bruen*, after reiterating "the standard for applying the Second Amendment" and justifying it, the Supreme Court applied this two-step standard to the New York statute at issue. *Bruen*, 597 U.S. at 32. Starting with the first step—whether the "Second Amendment's plain text covers an individual's conduct"—the Court began the analysis of this step as follows:

> It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of "the people" whom the Second Amendment protects. *See Heller*, 554 U.S. at 580, 128 S.Ct. 2783. ***Nor does any party dispute that handguns are weapons "in common use" today for self-defense. See id.***, at 627, 128 S.Ct. 2783; *see also* [*Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (per curiam)]. We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense.

*Id.* (emphasis added). As shown by this initial analysis, the Court addressed at step one whether (1) the petitioners were among the "people" protected by the Second Amendment and (2) the weapon at issue was "'in common use' today for self-defense," and it also indicated it was moving to analyzing whether the proposed conduct fell within the plain text of the Second Amendment. *Id.* Therefore, the Court seemingly included the common-use issue at step one of its clarified Second Amendment analysis. *See id.*

Following *Bruen*, most federal courts considering Second Amendment challenges address the common-use issue at step one of the analysis. *See, e.g.*, *United States v. Alaniz*, 69 F.4th

1124, 1128 (9th Cir. 2023) ("*Bruen* step one . . . requires a textual analysis, determining whether the challenger is part of the people whom the Second Amendment protects, whether the weapon at issue is in common use today for self-defense, and whether the proposed course of conduct falls within the Second Amendment." (citation and internal quotation marks omitted)); *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir.) ("Rahimi's possession of a pistol and a rifle easily falls within the purview of the Second Amendment. The amendment grants him the right to keep firearms, and possession is included within the meaning of keep. And it is undisputed that the types of firearms that Rahimi possessed are in common use, such that they fall within the scope of the amendment. Thus, *Bruen's* first step is met, and the Second Amendment presumptively protects Rahimi's right to keep the weapons officers discovered in his home." (internal quotation marks and citations omitted)), *cert. granted*, 143 S. Ct. 2688 (2023); *Oregon Firearms Fed'n v. Kotek Oregon All. for Gun Safety*, No. 22-CV-01815, 2023 WL 4541027, at *5 (D. Or. July 14, 2023) ("To determine whether the conduct at issue is covered by the plain text of the Second Amendment, a court must determine whether the weapon in question is a 'bearable arm' that is 'in common use today for self-defense.' If the weapon is in common use today for self-defense, then the Constitution presumptively protects that conduct." (citations omitted)); *see also Bevis*, 85 F.4th at 1197 ("Although we are satisfied that these appeals can be resolved at the first step of the *Bruen* framework—are the weapons among the Arms protected by the Second Amendment— for the sake of completeness we now turn to the question whether, if the weapons covered by the statutes before us ought to be considered bearable 'Arms,' the laws nonetheless pass muster under *Bruen's* second step."). At least one federal court did not. *See Teter v. Lopez*, 76 F.4th 938, 949–50 (9th Cir. 2023) (rejecting argument that "the purported 'dangerous and unusual' nature of butterfly knives means that they are not 'arms' as that term is used in the Second Amendment.

. . . [Instead], whether butterfly knives are 'dangerous and unusual' is a contention as to which Hawaii bears the burden of proof in the second prong of the *Bruen* analysis."). Despite these contrasting decisions, few federal courts have squarely addressed disputes over which step of *Bruen's* analysis contains the common-use issue. *See, e.g.*, *id.* (addressing argument over placement of common-use standard in *Bruen* analysis); *United States v. Lane*, No. 23CR62, 2023 WL 5663084, at *16 (E.D. Va. Aug. 31, 2023) ("The Defendant argues that the 'dangerous and unusual' inquiry is purely a *Bruen* step two matter. But the Court does not see it that way. Whether a weapon is 'dangerous and unusual' determines whether it is 'in common use.' And the *Heller* Court explained that the 'in common use' label limits 'the sorts of weapons protected' by the Second Amendment's 'right to keep and carry arms.' *Heller*, 554 U.S. at 627, 128 S.Ct. 2783. Because determining which 'arms' the amendment covers is a textual matter, in this Court's view (and others' too), the 'dangerous and unusual' issue is part of the textual analysis at *Bruen's* step one.").

Although the *Bruen* Court addressed the common-use issue at step one of its analysis, it is understandable why courts addressing Second Amendment issues thereafter have had to grapple with the placement of the common-use issue in the *Bruen* analysis. As indicated above, *Bruen's* first step requires a court to determine whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 24. If it does, then "the Constitution presumptively protects that conduct." *Id.*

As relevant here, the Second Amendment protects "the people['s]" right "to keep and bear Arms." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court interpreted the term "Arms" in the Second Amendment as follows:

> The 18th-century meaning is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence,

or armour of defence." 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978) (hereinafter Johnson). Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 1 A New and Complete Law Dictionary; see also N. Webster, American Dictionary of the English Language (1828) (reprinted 1989) (hereinafter Webster) (similar).

The term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity. For instance, Cunningham's legal dictionary gave as an example of usage: "Servants and labourers shall use bows and arrows on *Sundays*, & c. and not bear other arms." See also, *e.g.*, An Act for the trial of Negroes, 1797 Del. Laws ch. XLIII, § 6, in 1 First Laws of the State of Delaware 102, 104 (J. Cushing ed.1981 (pt. 1)); see generally *State v. Duke*, 42 Tex. 455, 458 (1874) (citing decisions of state courts construing "arms"). Although one founding-era thesaurus limited "arms" (as opposed to "weapons") to "instruments of offence *generally* made use of in war," even that source stated that all firearms constituted "arms." 1 J. Trusler, The Distinction Between Words Esteemed Synonymous in the English Language 37 (3d ed. 1794) (emphasis added).

Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, *e.g.*, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), and the Fourth Amendment applies to modern forms of search, e.g., *Kyllo v. United States*, 533 U.S. 27, 35–36, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.

554 U.S. at 581–82. This is a very expansive interpretation of "Arms," with the interpretation's

only limitation on a weapon's Second Amendment protection relating to "weapons that were not

specifically designed for military use and were not employed in a military capacity." *Id.* at 581;

*see also Caetano*, 577 U.S. at 418 (Alito, J., concurring) (explaining that "*Heller* defined the

Arms covered by the Second Amendment to include any thing that a man wears for his defence,

or takes into his hands, or useth in wrath to cast at or strike another." (internal quotation marks

omitted) (quoting *Heller*, 554 U.S. at 581)).

The *Heller* Court later discussed what **types** of weapons the Second Amendment protects:

We may as well consider at this point (for we will have to consider eventually) what types of weapons [*United States v. Miller*, 307 U.S. 1 (1939)] permits. Read in isolation, *Miller*'s phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939. We think that *Miller*'s "ordinary military equipment" language must be read in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." 307 U.S., at 179, 59 S.Ct. 816. The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. "In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same." *State v. Kessler*, 289 Ore. 359, 368, 614 P.2d 94, 98 (1980) (citing G. Neumann, Swords and Blades of the American Revolution 6–15, 252–254 (1973)). Indeed, that is precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface. We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right, see Part III, *infra*.

. . .

Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. See, *e.g.*, *Sheldon*, in 5 Blume 346; Rawle 123; Pomeroy 152–153; Abbott 333. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. See, *e.g.*, *State v. Chandler*, 5 La. Ann., at 489–490; *Nunn v. State*, 1 Ga., at 251; see generally 2 Kent, n. 2; The American Students' Blackstone 84, n. 11 (G. Chase ed. 1884). Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." See 4 Blackstone 148–149 (1769);

3 B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New–York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852). See also *State v. Langford*, 10 N.C. 381, 383–384 (1824); *O'Neill v. State*, 16 Ala. 65, 67 (1849); *English v. State*, 35 Tex. 473, 476 (1871); *State v. Lanier*, 71 N.C. 288, 289 (1874).

It may be objected that if weapons that are most useful in military service—M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

*Id.* at 624–28.

As illustrated by this discussion, in addressing the types of weapons protected by the Second Amendment, the Court explained that "the sorts of weapons protected were those 'in common use at the time'" because "that limitation is fairly supported by the ***historical tradition*** of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (emphasis added) (citations omitted). Due to the Court's reference to "historical tradition" here, it is arguable that the common-use limitation on protected "Arms" under the Second Amendment falls under step two of the *Bruen* analysis, which focuses on historical tradition. *See* 597 U.S. at 24; *Teter*, 76 F.4th at 949–50 (rejecting "Hawaii's argument that the purported 'dangerous and unusual' nature of butterfly knives means that they are not 'arms' as that term is used in the Second Amendment. *Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the 'historical tradition of prohibiting the carrying of dangerous and unusual weapons.' 554 U.S. at

627, 128 S.Ct. 2783 (emphasis added) (cleaned up). It did not say that dangerous and unusual weapons are not arms. Thus, whether butterfly knives are 'dangerous and unusual' is a contention as to which Hawaii bears the burden of proof in the second prong of the *Bruen* analysis."); *see also* Jamie G. McWilliam, *The Relevance of "In Common Use" After Bruen*, 2023 Harvard J.L. & Pub. Pol'y Per Curiam 37 at *2 (2023) ("[T]he common use standard was born of history, not the text of the Second Amendment, and considerations of historical tradition arise at *Bruen's* step two, not step one."). This interpretation of the common-use issue's inclusion at step two is also supported by the *Bruen* Court's analogizing of the "Second Amendment standard . . . with how we protect other constitutional rights." 597 U.S. at 24.

In particular, the *Bruen* Court compared the Second Amendment standard to that of "freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id.* (citing *Heller*, 554 U.S. at 582). The Court explained that the Government's burden under the First Amendment when it restricts speech "includes showing whether the expressive conduct ***falls outside of the category of protected speech***. And to carry that burden, the government must generally point to *historical* evidence about the reach of the First Amendment's protections." *Id.* at 24–25 (first emphasis added). If the Second Amendment's standard is in accordance with this First Amendment standard, then the Government would have the burden to prove whether an "Arm" falls outside the protection of the Second Amendment. To satisfy this burden, the Government would need to "point to *historical* evidence about the reach of the [Second] Amendment's protections." *Id.* Under *Bruen*, the Government does not have a burden until step two of the analysis. *See id.*

Resolving this question concerning the placement of the common-use issue in the *Bruen* inquiry is highly significant not only in this case, but in any future Second Amendment

challenge. If a court assesses whether a weapon is "'in common use' today for self-defense," at stage one, which would necessarily entail deciding whether the weapon is covered by the Second Amendment's plain text, then it alters the meaning of "Arms" in the Second Amendment to mean only those weapons "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32. It is arguable whether the *Bruen* Court intended to limit the meaning of "Arms" as such. Nevertheless, it is impossible to ignore that the author of the *Bruen* Majority Opinion, Justice Clarence Thomas, when applying the Second Amendment constitutionality standard he had thoroughly explained, addressed whether "handguns are weapons 'in common use' today for self-defense" at step one of the analysis. *Id.* This Court has no reason to believe that this happened accidentally. Accordingly, the Court will assess the common-use issue at step one of the *Bruen*/*Range* analysis.

a.  <u>Step One</u>

Starting with step one, the defendants contend that the Court should read the word "Arms" in conjunction with the prefatory phrase in the Second Amendment: "A well regulated Militia, being necessary to the security of a free state." Mot. to Dismiss Indictment ("Mot.") at 4, ECF No. 87; U.S. Const. amend. II. When so read, the Second Amendment would "cover firearms that are commonly used by armies or law enforcement, including machineguns which are common weapons among soldiers today." *Id.* The defendants also assert that machineguns are possessed by citizens for lawful purposes as evidenced by the approximately 740,000 machineguns registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives as of May 2021. *See id.* at 6–7. They point out that this number is almost quadruple the number of stun guns Justice Samuel Alito once found sufficient to show stun guns were a "legitimate means of self-defense." *Id.* at 7 (quoting *Caetano*, 577 U.S. at 420 (Alito, J., concurring)). They further

13

indicate that weapons which could shoot multiple rounds at a single time or with a single action were in existence in the 18th and early 19th century. *See id.*

None of the defendants' arguments have merit. Despite their claim to the contrary, the Second Amendment does not protect machineguns because they are not in common use for lawful purposes such as self-defense, as recognized by the Third Circuit Court of Appeals and all other circuit courts of appeals which have addressed the issue. *See United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 142 (3d Cir. 2016) ("*Palmetto St.*") ("[T]he Second Amendment does not protect the possession of machine guns. They are not in common use for lawful purposes." (citations omitted)); *Hollis v. Lynch*, 827 F.3d 436, 447–51 (5th Cir. 2016) ("*Hollis II*") (concluding Second Amendment does not protect machineguns because they are not "in common use"); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) ("In short, machine guns are highly 'dangerous and unusual weapons' that are not 'typically possessed by law-abiding citizens for lawful purposes.' *Heller*, 554 U.S. at 625, 627, 128 S.Ct. 2783. Thus, we hold that the Second Amendment does not apply to machine guns."); *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012) ("Regardless of his membership in the unorganized militia of the State of Connecticut, the Second Amendment does not protect Zaleski's personal possession of machine guns." (citing *Heller*, 554 U.S. at 624–25)); *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009) ("Hamblen's challenge to his conviction for unlawful possession of unregistered machine guns has been directly foreclosed by the Supreme Court, which specifically instructed in *Heller* that 'the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes.' *Id.* at 2815-16. Moreover, the *Heller* Court expressly rejected Hamblen's reading of *United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206

(1939), when it opined that it would be a 'startling' interpretation of precedent to suggest that restrictions on machine guns, set forth in the National Firearms Act, might be unconstitutional. *See Heller*, 128 S.Ct. at 2815. Thus, whatever the individual right to keep and bear arms might entail, it does not authorize an unlicensed individual to possess unregistered machine guns for personal use."), *cert. denied*, 559 U.S. 1115 (2010); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."), *cert. denied*, 555 U.S. 1174 (2009); *United States v. Lucero*, 43 F. App'x 299, 301 (10th Cir.) (Lucero, J., concurring) ("I am not persuaded that the semi-automatic and fully automatic 'machineguns' which defendant sold to federal agents, and which have been outlawed by federal legislation, are the type of arms subject to Second Amendment protection."), *cert. denied*, 537 U.S. 1064 (2002). Even in some circuits where the court of appeals has not addressed whether the Second Amendment covers machineguns, district courts in those circuits are unanimous in concluding that machineguns are unprotected. *See, e.g.*, *Capen v. Campbell*, Civ. A. No. 22-11431, 2023 WL 8851005, at *8 (D. Mass. Dec. 21, 2023) ("[H]andguns, rifles, and shotguns are the general types of firearms that are in common use by ordinary citizens for lawful purposes. Machine guns are not. Nor, for that matter, are mortars, rocket launchers, or shoulder-fired missile systems."); *United States v. Jones*, Crim. A. No. 23-cr-126, 2023 WL 8374409, at *7 (S.D. Ala. Dec. 3, 2023) ("Second Amendment protections simply do not extend to machineguns (or in this case one that has been converted to one)." (citations omitted)); *Lane*, 2023 WL 5663084, at *15–16 (pointing out that all district courts post-*Bruen*, as well as all circuit courts which have addressed issue of the constitutionality of possessing machineguns, have concluded that machineguns do not receive Second Amendment

protection; concluding that "Second Amendment's plain text does not cover . . . possession" of machineguns because they "are 'dangerous and unusual' weapons and thus are not weapons 'in common use'"); *United States v. Cooperman*, No. 22-CR-146, 2023 WL 4762710, at *3 (N.D. Ill. July 26, 2023) ("[T]he Court joins other courts in this district and elsewhere in holding that possessing machineguns is not conduct covered by the plain text of the Second Amendment as machineguns are dangerous and unusual weapons." (citations omitted)); *DeWilde v. United States*, No. 23-CV-00003, 2023 WL 4884582, at *7 (D. Wyo. July 17, 2023) ("Because firearms such as an M16 or other machineguns are dangerous and unusual weapons, they are outside the scope and protection of the Second Amendment. Section 922(o) is not unconstitutional.").[4]

The defendants attempt to avoid this consensus and, in particular, the Third Circuit's otherwise binding decision in *Palmetto St.*, by arguing that *Bruen* and *Range* abrogated *Palmetto St.'s* holding that the Second Amendment does not protect machineguns. *See* JP's Reply at 6; Def.'s Reply to Gov't's Resp. in Opp'n to Def.'s Mot. to Dismiss Indict. ("JR's Reply") at 4, ECF No. 100 ("Moreover, as counsel for Mr. Berger's codefendant, Joseph P. Berger persuasively argues in her recent reply brief, the reasoning in both *Miller* and [*Palmetto St.*], another case cited by the government for the proposition the Second Amendment does not protect machine guns, has been abrogated by *Heller* and *Bruen*, as recognized in [*Range*]." (citing JP's Reply at 5–6)). They claim that *Palmetto St.* was abrogated for two reasons: First, they assert that *Range* "refused to read [dicta from *Heller*] into the plain text of the Second Amendment" as the Third Circuit did in *Palmetto St. See* JP's Reply at 6. Second, they posit that *Palmetto St.* relied on *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) to reach its

---

[4]    District courts nation-wide are unanimous in concluding that the Second Amendment does not protect an individual's possession of a machinegun. *See Lane*, 2023 WL 5663084, at *15 (citing cases).

decision on machineguns, and *Bruen* "specifically rejected" the test used in *Marzzarella*. *See id.*
As explained below, the defendants are very much mistaken in both respects.

Concerning *Range's* possible impact on *Palmetto St.*, the *Range* Court addressed whether
"the federal 'felon-in-possession' law—18 U.S.C. § 922(g)(1)—violate[d Range's] Second
Amendment right to keep and bear arms." 69 F.4th at 98. In doing so, the Third Circuit first
analyzed "whether Range is one of 'the people' who have Second Amendment rights." *Id.* at
101. As evidenced by the framing of this question, the Third Circuit was unconcerned with
whether the Second Amendment protected a particular type of weapon in *Range*.

With that context, the Third Circuit, in its **only** reference to "dicta" in the Majority
Opinion, stated, "[T]he criminal histories of the plaintiffs in *Heller*, [*McDonald v. City of
Chicago*, 561 U.S. 742 (2010)], and *Bruen* were not at issue in those cases. So their references to
'law-abiding, responsible citizens' were dicta." *Id.*[5] While it appears that the Third Circuit
declined to read what it construed as dicta from *Heller*, *McDonald*, and *Bruen* into the Second
Amendment, the Third Circuit's statement about dicta is inapplicable to the defendants' case
here because this case is concerned with whether the Second Amendment covers the "Arms" at
issue here instead of with whether it covers "the people" here.[6] As such, the Third Circuit's
statement about dicta in *Heller*, *McDonald*, and *Bruen* does not remotely support a determination
that *Range* somehow abrogated *Palmetto St.'s* decision on machineguns.

Regarding *Palmetto St.'s* reliance on *Marzzarella*, the defendants are incorrect that *Bruen*
affected the test used by the Third Circuit in *Marzzarella* so as to abrogate *Palmetto St.*

---

[5]     In support of his contention about *Heller's* dicta, JP Berger cites to this page of *Range* in
which this quotation is located. *See* JP's Reply at 6 (citing *Range*, 69 F.4th at 101).
[6]     Due to the entirely different topic upon which *Range* was addressing with its reference to
dicta, it is almost inconceivable how JP Berger argues that the Third Circuit's statement about
dicta is applicable here, and how JR Berger finds this argument to be "persuasive."

Undeniably, the Third Circuit in *Marzzarella* adopted the type of two-part test for Second Amendment challenges which was rejected in *Bruen*. *See* 614 F.3d at 89 ("As we read *Heller*, it suggests a two-pronged approach to Second Amendment challenges. First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid." (internal citation and footnote omitted)); *Bruen*, 597 U.S. at 19 ("Despite the popularity of this two-step approach, it is one step too many. . . . *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context."). Nevertheless, the *Bruen* Court was focused on the constitutional inadequacy of the second part of *Marzzarella's* two-part test, not the first, *see Bruen*, 597 U.S. at 19 ("Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history."); *Range*, 69 F.4th at 100 (explaining that, after *Heller*, the Third Circuit "utilize[ed] means-end scrutiny at the second step," and pointing out that "[b]oth sides agree that we no longer conduct means-end scrutiny"), and the *Marzzarella* Court was addressing the first part of its two-part test when it concluded that "the right to bear arms, as codified in the Second Amendment, affords no protection to 'weapons not typically possessed by law-abiding citizens for lawful purposes.'" 614 F.3d at 90–91 (quoting *Heller*, 554 U.S. at 625)).[7] Moreover, *Marzzarella* based this conclusion on *Heller*, *see* 614 F.3d at 90–91,

---

[7]     A sub-theme for the defendants' arguments is that, as law-abiding citizens, the Second Amendment protects their right to have any weapon in their own home. The *Marzzarella* Court rejected the notion that possession of any weapon in one's home for self-defense always warrants Second Amendment protection:

> [I]t cannot be the case that possession of a firearm in the home for self-defense is a protected form of possession under all circumstances. By this rationale, any type of firearm possessed in the home would be protected merely because it could be used

and *Bruen* did not disturb *Heller*. *See* 597 U.S. at 17 ("***In keeping with Heller***, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."); *see also United States v. Kittson*, No. 21-cr-00075, 2023 WL 5015812, at *2 (D. Or. Aug. 7, 2023) ("Defendant argues that when *Bruen* overruled the Ninth Circuit's previous Second Amendment test, it also overruled [*United States v. Henry*, 688 F.3d 637 (9th Cir. 2012), which held that 'machine guns are "dangerous and unusual weapons" that are not protected by the Second Amendment.'] But in concluding that 'machineguns are highly "dangerous and unusual weapons" that are not "typically possessed by law-abiding citizens for lawful purposes,"' *Henry* employed the same standard established by *Heller* and confirmed in *Bruen*. *See Henry*, 688 F.3d at 640 (citing *Heller*, 554 U.S. at 625). Because *Heller* was undisturbed by *Bruen*, and *Henry* reached its holding by relying on *Heller*, *Henry* is binding precedent on this Court. *See* [*Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018)]."). Therefore, *Bruen* did not impact *Marzzarella*'s conclusion on the types of weapons protected by the Second Amendment, which consequently would not abrogate the holding in *Palmetto St.* because it relied in part on *Marzzarella* when it concluded that the Second Amendment does not protect the possession of machineguns.[8]

---

for self-defense. Possession of machine guns or short-barreled shotguns—or any other dangerous and unusual weapon—so long as they were kept in the home, would then fall within the Second Amendment. But the Supreme Court has made clear the Second Amendment does not protect those types of weapons. *See Miller*, 307 U.S. at 178, 59 S.Ct. 816 (holding that short-barreled shotguns are unprotected); *see also United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."), *cert. denied*, 129 S.Ct. 1369 (2009). 614 F.3d at 94 (citations omitted).

[8]    Unlike *Palmetto St.*, *Marzzarella* did not address the constitutionality of an individual's possession of machineguns. *See* 614 F.3d at 87 (stating issue related to defendant's "possession of a handgun with an obliterated serial number" in violation of 18 U.S.C. § 922(k)). There are

The defendants' other contentions fare no better. Their notion that the Second Amendment covers firearms that are commonly used by armies or law enforcement, including machineguns which are common weapons among soldiers today, is absurd.[9] The phrase "bear arms" in the Second Amendment "unambiguously . . . refer[s] to the carrying of weapons outside an organized militia." *Heller*, 554 U.S. at 584; *see id.* at 581 (explaining that "[t]he term [arms] was applied, then as now, to weapons that were ***not specifically designed for military use and were not employed in a military capacity***" (emphasis added)). If it did not, "its . . . meaning would cause the protected right to consist of the right to be a soldier or to wage war—an absurdity that no commentator has ever endorsed." *Id.* at 586. Moreover, "taking [the defendants'] argument would demand that the entire law-abiding citizenry is permitted to possess the same weapons our armed forces utilize." *DeWilde*, 2023 WL 4884582, at *6. If that is the case, "[w]here is the limit? Tanks, bombs, [or] nuclear weapons. This is beyond outlandish[.]" *Id.*

---

only two references to "machine guns" in *Marzzarella's* majority opinion. *See id.* at 94. The different primary concern addressed by *Marzzarella* further weakens the defendants' argument about its possible negative impact on *Palmetto St.* because only *Palmetto St.* specifically addressed whether the Second Amendment protects machineguns, and concluded it does not.

[9]     The *Heller* Court specifically rejected the defendants' argument here that reading the term "Arms" in conjunction with the Second Amendment's prefatory clause justified a broader interpretation of "Arms":

> It may be objected that if weapons that are most useful in military service—M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

554 U.S. at 627–28.

As for the defendants' reliance on the approximately 740,000 machineguns lawfully owned in the United States, the Court recognizes that other courts have looked to statistical data when addressing the common-use issue:

> Every post-*Heller* case to grapple with whether a weapon is "popular" enough to be considered "in common use" has relied on statistical data of some form, creating a consensus that "common use is an objective and largely statistical inquiry." *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015) (quotation marks omitted). Still, "what line separates 'common' from 'uncommon' ownership is something the Court did not say." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). As a result, courts have differed in the statistics used and methodological approaches adopted.
>
> Some courts have taken the view that the total number of a particular weapon is the relevant inquiry. The Second Circuit determined that "large-capacity magazines" are in common use solely because of their high absolute number: 50 million. *Cuomo*, 804 F.3d at 255. Other courts have relied on proportions and percentages. The Fourth Circuit found that AR–15s are in common use because they accounted for "5.5 percent of all firearms, and 14.4 percent of all rifles produced in the [United States]...." *Kolbe v. Hogan*, 813 F.3d 160, 174, *reh'g en banc granted*, 636 Fed.Appx. 880 (4th Cir. 2016). The Seventh Circuit, though, held the opposite when it determined that AR–15s are not in common use because only "9% of the nation's firearms owners have assault weapons." *Friedman*, 784 F.3d at 409. These cases indicate there is considerable variety across the circuits as to what the relevant statistic is and what threshold is sufficient for a showing of common use.
>
> More recently, two Supreme Court justices observed that the "relevant statistic" involves the counting of jurisdictions. In addressing whether stun guns are in common use, Justice Alito, joined by Justice Thomas, implied that the number of states that allow or bar a particular weapon is important:

>> [T]he number of Tasers and stun guns is dwarfed by the number of firearms. This observation may be true, but it is beside the point.... The more relevant statistic is that [200,000] ... stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States.... While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country.

> *Caetano*, 136 S.Ct. at 1032–33 (citations and quotation marks omitted). These two justices suggested that the 200,000 absolute number, plus that 45 states have "accepted [stun guns] as a legitimate means of self-defense," was enough to determine that the stun gun is in common use. *Id.*

> This wide variety in methodological approaches suggest that these statistics—raw number, percentage and proportion, jurisdiction-counting—identify potentially relevant data for the common use inquiry. For purposes of the present case, we conclude it does not matter which set of numbers we adopt. None of them allow a conclusion that a machinegun is a usual weapon.

*Hollis II*, 827 F.3d at 449.[10] Nevertheless, multiple courts have persuasively rejected the precise argument the defendants are positing here. *See, e.g.*, *Cooperman*, 2023 WL 4762710, at *3 ("Cooperman argues machineguns are not dangerous and unusual because they are in common use. In support, Cooperman cites to an ATF report stating that there are 741,146 total registered machineguns throughout the country. Possession of these machineguns is lawful pursuant to the 'grandfather clause' in 18 U.S.C. § 922(o)(2)(B), which permits 'possession of a machinegun that was lawfully possessed before [1986].' Courts have rejected similar arguments using these figures to show 'common use.' *See Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (holding that "[n]one [of the statistics presented] allow a conclusion that a machinegun is a usual weapon")). In *Hollis*, the Fifth Circuit noted that the Courts of Appeal have looked for numbers in the millions of weapons to establish common use. *Id.*; *see also United States v. Simien*, No.

---

[10]     Other courts have noted that relying on statistics when determining a weapon's common use is potentially problematic. *See, e.g.*, *Friedman*, 784 F.3d at 409 ("[R]elying on how common a weapon is at the time of litigation would be circular to boot. Machine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal. Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity."); *Capen*, 2023 WL 8851005, at *8 (rejecting argument that "if a weapon is popular—that is, if thousands or even millions of copies of that weapon have been sold—then, by definition, it is 'in common use' and is protected by the Second Amendment" because (1) "the constitutionality of the regulation of different firearms would ebb and flow with their sales receipts," (2) "an entirely novel weapon that achieved rapid popularity could be rendered beyond the reach of regulation if innovation and sales outstripped litigation," and (3) "the constitutional analysis would be trapped in an infinite circularity: a weapon may be banned because it is not in common use, and it is not in common use because it is banned").

SA-22-CR-00379-JKP, 2023 WL 1980487, at *9 (W.D. Tex. Feb. 10, 2023) (holding that the same statistics Cooperman now cites are still 'too insignificant for machineguns to be considered common use')." (alterations in original) (internal citations to record omitted)); *United States v. Kazmende*, No. 22-CR-236, 2023 WL 3872209, at *4 (N.D. Ga. May 17, 2023) ("Defendant suggests that machineguns are not unusual, pointing to ATF statistics that he maintains establish the fact that of the 7,512,175 guns in the United States, 10.14% are machineguns. The Government maintains that his figures are simply wrong. Either way, other judges on this Court have rejected a similar argument in the past, noting that the statistics Defendant relies upon include guns possessed by law enforcement, as well as weapons owned before § 922(o) took effect. [*United States v. Beard*, Crim. No. 20-cr-00351, 2022 WL 18657429, at *7 (N.D. Ga. June 3, 2022), *report and recommendation adopted*, No. 20-CR-00351, 2023 WL 372914 (N.D. Ga. Jan. 24, 2023)]. The Fifth Circuit in *Hollis* considered a number of statistics about machineguns and found that "[n]one of them allow a conclusion that a machinegun is a usual weapon." 827 F.3d at 449; *see also Simien*, 2023 WL 1980487, at *9 (noting that civilian-owned machineguns accounted for less than .2% of the total firearms in the United States and concluding that they therefore remain "too insignificant" to be considered in common use)." (second alteration in original) (internal citations to record omitted)), *report and recommendation adopted*, No. 22-CR-00236, 2023 WL 3867792 (N.D. Ga. June 7, 2023).[11]

---

[11]     The defendants' comparison of the amount of machineguns to the amount of stun guns Justice Alito found to demonstrate common use in *Caetano* is also unpersuasive:

> Justice Alito did not think the absolute number by itself was sufficient. Rather, he thought the number was sufficient when paired with the statistic that stun guns may be lawfully possessed in 45 states. The same showing cannot be made for machineguns. Twelve states and the District of Columbia entirely ban machineguns even if the weapon is legal under the Gun Control Act. An additional 22 states, like Texas in the present case, ban machineguns unless the weapon is legal under federal law. Thus, 34 states and the District of Columbia prohibit possessing machineguns.

At bottom, the Second Amendment does not protect machineguns because they are not in common use today for self-defense. The defendants' arguments for protection of their machineguns fly in the face of *Heller*, *Bruen*, and every other decision that has ever addressed whether the Second Amendment protects an individual's possession of machineguns. Accordingly, the Motion to Dismiss the machinegun-related charges in the Indictment fails at step one of the *Bruen* analysis.

　　　　　　　b.　　Step Two

Nevertheless, for sake of completeness, the Court will presume that the common-use issue belongs in step two of the *Bruen/Range* analysis. Even at step two, dismissal of the defendants' machinegun charges is unwarranted because the Government has "demonstrate[d] that the regulation[s on the possession of machineguns] is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

"Historical tradition can be established by analogical reasoning, which 'requires only that the government identify a well-established and representative historical analogue, not a historical twin.'" *Range*, 69 F.4th at 103 (quoting *Bruen*, 597 U.S. at 30 ("[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check.")). "Regulations targeting longstanding problems must be 'distinctly similar' to an historical analogue, but modern regulations that were unimaginable at the founding need only be 'relevantly similar' to one." *United States v. Green*, Crim. No. 22-387, 2023 WL 6164407, at *2 (E.D. Pa. Sept. 21, 2023) (cleaned up) (quoting *Range*, 69 F.4th at 103). Ultimately, the "central considerations" of the historical inquiry are "whether modern and historical regulations impose a

---

Only 16 states have no such prohibition, but even some of these states have some sort of restriction affecting or limiting machinegun possession.

*Hollis II* at 450 (footnotes omitted).

comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 597 U.S. at 29.

Here, the Government attempts to satisfy its burden at step two by reiterating its arguments at step one and pointing out that the *Heller* Court already identified the historical tradition of machinegun regulation as a "dangerous and unusual weapon." *See* Gov't's Opp'n at 12–13. In response, the defendants contend that the Government has failed to meet its burden because (1) the *Heller* Court's discussion about machineguns is dicta, (2) the *Heller* Court identified a historical tradition which prohibits the "carrying" of dangerous and unusual weapons, and not the mere "possession" of those weapons, (3) the common law offense relating to "dangerous and unusual weapons" was concerned with individuals using such weapons to terrorize and disturb the public and not with the mere possession of such weapons, (4) there were no laws in existence in the 18th century pertaining to possessing dangerous and unusual weapons in the nature of machineguns, and (5) it failed to demonstrate a tradition of banning entire classes of firearms. *See* JP's Reply at 9–11; JR's Reply at 6–7. As explained below, to the extent necessary here, the Government has met its burden to show that the "regulation[s on the possession of machineguns] is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 29.

The Court turns first to the defendants' attempt to distinguish the historical tradition referenced in *Heller* because the *Heller* Court referenced "carrying" instead of "possessing." To the extent the defendants are arguing that *Heller* Court's discussion of the historical tradition of "prohibiting the carrying of 'dangerous and unusual weapons'" is dicta, even if it is, it would not preclude the Government or the Court from relying upon it here. *See Marzzarella*, 614 F.3d at 90 n.5 (explaining that "even if [a portion of *Heller* is] dicta, it is Supreme Court dicta, and, as such,

requires serious consideration" (citations omitted)); *Heleva v. Brooks*, 581 F.3d 187, 188 n.1 (3d Cir. 2009) ("[W]e do not view [Supreme Court] dicta lightly." (alterations in original) (internal quotation marks omitted)). As another district court has explained when addressing a defendant's contention that this portion of *Heller* is dicta:

> *Heller* is, to be sure, a case about handgun regulations, and not about machineguns. And the analysis in the various opinions the Justices issued in Heller is lengthy and dense at times, covering some 150 pages in the United States Reports. But the discussion in the majority's opinion about dangerous and unusual weapons was necessary to distinguish *Miller*, upon which Justice Stevens placed "overwhelming reliance" in his dissent. *Heller*, 554 U.S. at 621. . . . But even if some of the discussion in *Heller* about those weapons that are outside the protection of the Second Amendment is dicta (and I do not think that it is), it is Supreme Court dicta. And that is not something "to be lightly cast aside." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (internal quotation marks omitted).

*Kazmende*, 2023 WL 3872209, at *4 n.7.

As for the *Heller* Court's use of the term "carrying" instead of "possessing," the defendants are correct that the Court only mentioned "the historical tradition of prohibiting the ***carrying*** of 'dangerous and unusual weapons.'" 554 U.S. at 627. On the other hand, they are mistaken that this somehow demonstrates this historical tradition is not analogous here for two reasons. First, they ignore the introductory sentence in the paragraph leading to the *Heller* Court's statement about "carrying," where the Court explained that it was "recogniz[ing] another important limitation on the right to ***keep*** and carry arms." *Id.* (emphasis added). Only thereafter did the Court state that "the sorts of weapons protected were those 'in common use at the time[,]'" and express that this "limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (citations omitted). Reading this language in its entirety shows that the Court was indicating that "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" "fairly supported" the common-use limitation on the "right to ***keep*** and carry arms." *Id.* (emphasis added).

Second, the argument that *Heller*'s "dangerous and unusual" language does not apply to the mere possession of a firearm has already been soundly rejected:

> Watson nonetheless argues that the District Court misapplied *Heller's* "dangerous and unusual" language because the doctrine does not pertain to "the mere *possession* of a firearm," but only applies to "the *manner* in which that right is exercised." . . . Watson's unconventional reading contradicts the interpretation adopted by all of the federal circuits that have considered this language. *See, e.g.*, *Friedman*, 784 F.3d at 409; *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015); *Henry*, 688 F.3d 637; *Heller II*, 670 F.3d 1244; *Marzzarella*, 614 F.3d 85; *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010); *Fincher*, 538 F.3d 868. Watson himself concedes that "a majority of courts" interpret the "dangerous and unusual" language in Heller to describe possession of a weapon, but in fact no case was found adopting the alternative analysis proposed by Watson.
>
> This is likely because *Heller* plainly states that mere possession of certain weapons may be prohibited. *See, e.g.*, *Heller*, 554 U.S. at 626, 128 S.Ct. 2783 (noting that the Second Amendment is "not a right to *keep* and carry any weapon whatsoever") (emphasis added); *id.* at 627, 128 S.Ct. 2783 (suggesting that the possession of "M–16 rifles and the like" may be banned); *id.* at 624, 128 S.Ct. 2783 (same); *see also Miller*, 307 U.S. at 178, 59 S.Ct. 816 (holding that short-barreled shotguns are unprotected under the Second Amendment). And looking at the "dangerous and unusual" phrase in context, the most logical reading is that "dangerous and unusual" describes certain categories of weapons, and not the manner in which the weapons are used. The Court discusses "dangerous and unusual" weapons immediately after discussing what "sorts of weapons" *Miller* protects, and just before the Court discusses why certain types of weapons, even those "that are most useful in military service—M–16 rifles and the like—" may be banned. *See Heller*, 554 U.S. at 627, 128 S.Ct. 2783. We therefore decline to adopt Watson's interpretation of *Heller's* "dangerous and unusual" language.

*Palmetto St.*, 822 F.3d at 143 (internal citations to record omitted); *see also DeWilde*, 2023 WL 4884582, at *7 ("The Court also rejects Plaintiff's argument that 'dangerous and unusual' refers to the common law offense of 'affray' or the manner in which persons bear arms."); *Kazmende*, 2023 WL 3872209, at *4 ("[T]he fact that Defendant did not use the machinegun is simply not relevant to whether that weapon is protected by the Second Amendment."); *Hollis v. Lynch*, 121

F. Supp. 3d 617, 636–38 (N.D. Tex. Aug. 7, 2015) ("*Hollis I*") (rejecting similar argument), *aff'd but criticized on other grounds by Hollis II*.[12]

---

[12]     In *Hollis I*, the district court persuasively addressed the applicability of *Heller's* "dangerous and unusual" phrase to possession of a weapon as follows:

> Hollis contends that the "dangerous and unusual" doctrine does not apply to the mere possession of a weapon, but rather only applies to the manner in which the right is exercised, and this case is not about the carrying of dangerous and unusual weapons, but rather only about the possession of a firearm. For example, Hollis argues that the Supreme Court's discussion of "dangerous and unusual weapons" is derived from the common law offense of "affray." Hollis argues that the common law's definition of "dangerous" in the context of an "affray" was any item that could be used to take human life through physical force, and "unusual" meant to use a protected arm in a manner which creates an affray. Thus, Hollis argues that it is the *manner* in which the right is exercised, not the type of weapon that is carried, that must be analyzed under the dangerous and unusual doctrine. Defendants respond, however, that the common law crime of affray cannot displace precedent by the Supreme Court that dangerous and unusual weapons fall outside the scope of the Second Amendment, and *Heller* made it clear that the scope of the modern right is not cabined by historical examples. *Heller*, 554 U.S. at 582, 627–28, 128 S.Ct. 2783; *see United States v. Marzzarella*, 614 F.3d 85, 90–91 (3d Cir. 2010) (explaining that the right to bear arms affords no protection to weapons not typically possessed by law-abiding citizens for lawful purposes).
>
> . . .
>
>      [T]he Court's holding in *Miller*, read in conjunction with the Court's discussion of *Miller* and M–16 rifles in *Heller*, establishes that possessing a machine gun, and specifically an M–16 rifle, does not fall within the scope of the Second Amendment. Hollis' attempt to reargue the common law crime of "affray" does not succeed in light of the Supreme Court's discussion of the exact automatic weapon at issue in this case, the M–16 machine gun. If the Supreme Court had been limiting its discussion to the carrying of such a weapon, and not to its mere possession, as Hollis suggests, the Court would have more clearly said so. Hollis' distinction between "carrying" and "possession" of automatic weapons is unpersuasive, as the Court in *Heller* described the dangerous and unusual weapons doctrine from *Miller* as a limitation on the right to "keep and carry arms." *See Heller*, 554 U.S. at 627, 128 S.Ct. 2783 (emphasis added). . . .
>
> . . .
>
> Thus, *Heller* recognized that the right to keep and carry bear arms only extends to those arms in common use at the time, and the right to keep and bear arms does not include a right to possess a specific firearm or type of firearm. *See Heller*, 554 U.S. at 627, 128 S.Ct. 2783. It is also worth noting that the Supreme Court clearly found startling the prospect that the machine gun ban would have been unconstitutional, thereby suggesting the constitutional validity of the machine gun restrictions in the NFA and GCA. *See id.* at 624, 128 S.Ct. 2783.

Regarding the defendants' argument that the Government failed to meet its burden because there were no laws in existence in the 18th century pertaining to possessing "dangerous and unusual weapons" in the nature of machineguns, the Court interprets this as their contention that the Government did not demonstrate the requisite historical tradition of machinegun regulation. This argument also lacks merit because the defendants overstate the Government's burden. The Government need only "identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 597 U.S. at 30. Here, even if the Court would interpret *Heller*'s discussion of "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" 554 U.S. at 627, as pertaining to only the carrying of such weapons and not the mere possession of them, it is "analogous enough" to support the conclusion that the statutes at issue here "pass constitutional muster." *Bruen*, 597 U.S. at 30.[13]

Overall, no matter at which step of the *Bruen* analysis the Court considers the common-use of machineguns today for self-defense, the defendants' Motion to Dismiss does not warrant

---

*Hollis I* at 636–38 (internal citations to record omitted).

[13]    The Court's resolution of this argument also resolves the defendants' contention that the Government failed to show that there is a historical tradition of prohibiting certain types of firearms in their entirety. *Heller* identifies that there was such a historical tradition pertaining to "dangerous and unusual" weapons, and "plainly states that mere possession of certain weapons may be prohibited." *Palmetto St.*, 822 F.3d at 143; *see also id.* at 143–44 ("Watson's arguments against categorical bans on certain firearms fail to persuade. *Heller* limits its holding to bans on 'handguns held and used for self-defense in the home.' *Heller*, 554 U.S. at 636, 128 S.Ct. 2783. *Heller* gives special consideration to the District of Columbia's categorical ban on handguns because they 'are the most popular weapon chosen by Americans for self-defense in the home.' *Id.* at 629, 128 S.Ct. 2783. This does not mean that a categorical ban on any particular type of bearable arm is unconstitutional. As explained above, *Heller* contains clear statements to the contrary."). In addition, *Miller*, which neither *Heller* nor *Bruen* overruled, held that the Second Amendment did not protect the "possession or use" of an entire type of firearm, namely short-barreled shotguns. 307 U.S. at 178.

dismissal of the machinegun-related charges in Counts One and Two of the Indictment. If the Court considers the common-use issue at step one, as Justice Thomas did in *Bruen*, then *Palmetto St.*, as well as the persuasive decisions of all other federal courts to address the issue, compels the conclusion that machineguns are not in common use for self-defense. If the Court presumes that the Second Amendment somehow protects the possession of machine guns and considers the common-use issue at step two, the Government has met its burden to "'affirmatively prove that its [machinegun] regulation[s are] part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *Range*, 69 F.4th at 101. Accordingly, the Motion to Dismiss, insofar as it seeks dismissal of Counts One and Two of the Indictment, is denied.

      **B.**      **<u>As Applied Challenge to the Silencer Charge in Count III of the Indictment</u>**

          **1.**      **Statute at Issue**

Count Three of the Indictment relates to the defendants' alleged failure to properly register their twelve silencers in the NFRTR, as required by the NFA. *See* Indict. at 5. As already explained, Section 5861(d) of the NFA provides that "[i]t shall be unlawful for any person . . . (d) to receive or possess a firearm which is not registered to [them] in the [NFRTR]." 26 U.S.C. § 5861(d). The term "firearm" in Section 5861(d) is defined as, *inter alia*, "(7) any silencer (as defined in section 921 of title 18, United States Code)[.]" *Id.* § 5845(a). The term "silencer" in Section 921 of the Criminal Code is defined as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm

muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(25).[14]

### 2.      Analysis: As-Applied Challenge

As with the challenges to the machinegun-related charges, the defendants' challenge to the silencer-related charge first turns on whether silencers are "Arms" under the Second Amendment. The defendants argue silencers qualify as "Arms" under the Second Amendment for five reasons. First, they point out that even though silencers were not invented at the time of the enactment of the Second Amendment, its plain text covers silencers because the Supreme Court has explained that it includes "Arms" "that were not in existence at the time of the founding." Mot. at 7 (quoting *Heller*, 554 U.S. at 582). Second, they assert that *Heller* considered "Arms" as including "'weapons of offence, or armour of defence,' or 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another,'" and silencers are "an integral part of a firearm." JP's Reply at 7 (quoting *Heller*, 554 U.S. at 581). Third, they posit that silencers should be treated similar to "the various firearm accessories historically considered to be arms for Second Amendment purposes" because silencers, *inter alia*, "are necessary to the use of firearms insofar as they are necessary to[, *inter alia*,] prevent long-term hearing damage." JP's Reply at 7–9. Fourth, they contend that silencers should be considered as "Arms" under the Second Amendment because the Government considers silencers as "firearms" in the NFA. *See* Mot. at 7; JP's Reply at 7. Finally, the defendants indicate that as of 2021, 2.6 million silencers were legally possessed in the United

---

[14]      Pursuant to the Gun Control Act of 1968 ("GCA"), a "firearm" is defined as, *inter alia*, "any firearm muffler or firearm silencer." 18 U.S.C. § 921(a)(3); *see also Sig Sauer, Inc. v. Jones*, 133 F. Supp. 3d 364, 366 (D.N.H. 2015) (explaining that "[t]he NFA adopts the definition of the term 'firearm silencer' used in the Gun Control Act"), *aff'd sub nom.*, *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016).

States, which shows that they are "typically possessed by law-abiding citizens for lawful purposes." *Id.* (quoting *Heller*, 554 U.S. at 625).

In response to the defendants' arguments, the Government asserts that silencers are not weapons; instead, "they are accessories that are used to silence, muzzle, or diminish the report of a firearm." Gov't's Opp'n at 16 (citing 18 U.S.C. § 921(a)(25)).[15] The Government notes that silencers are not, in themselves, used to "cast or strike at another" and they also "do not serve any intrinsic purpose in self-defense." *Id.* (quoting *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *4 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022)). The Government also points out that every court to address silencers has concluded that silencers are not "Arms" under the Second Amendment. *See id.* at 16–17 (citing cases). Further, they contend that the Court should not rely on how Congress has defined "firearm" in the NFA or GCA because *Range* explicitly stated that district courts should not consider Congress' inclusion of silencers in the definition of "firearm" when interpreting the Second Amendment. *See id.* at 17 (citing *Range*, 69 F.4th at 102–03).

In addressing the parties' contentions, the Court must first determine whether a silencer is a bearable "Arm" under the Second Amendment. As the parties' accurately state, the *Heller* Court defined "Arms" as "[w]eapons of offence, or armour of defence" and "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581 (citations omitted). As to whether a silencer fits within *Heller's* definition of "Arms," neither the Third Circuit nor any district court in this circuit has addressed this issue.

---

[15]     Section 921(a)(25) defines "[t]he terms 'firearm silencer' and 'firearm muffler'" as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(25).

Nevertheless, every other federal court to squarely address whether a silencer is a bearable "Arm" within the meaning of the Second Amendment has concluded that it is not because it is only a firearm accessory. *See, e.g.*, *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("[B]ecause silencers are not 'bearable arms,' they are outside the Second Amendment's guarantee."); *Capen*, 2023 WL 8851005, at *17 ("[S]ome accessories, such as silencers, do not affect the essential operation of a weapon and so do not fall within the scope of the Second Amendment's protection."); *Second Amendment Found., Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, Civ. A. No. 21-CV-0116, 2023 WL 7490149, at *13 (N.D. Tex. Nov. 13, 2023) ("[A]n 'accessory' like a silencer does not implicate the Second Amendment because 'a firearm remains an effective weapon without a silencer.'" (quoting *Hasson*, 2019 WL 4573424, at *4–5)); *United States v. Peterson*, Crim. A. No. 22-231, 2023 WL 5383664, at *2 (E.D. La. Aug. 21, 2023) ("[S]ilencers are not bearable arms within the score of the Second Amendment even in light of *Bruen* or its progeny."); *Cooperman*, 2023 WL 4762710, at *1 ("The plain text of the Second Amendment does not protect accessories that are not bearable arms, such as silencers."); *Cox v. United States*, No. CR11-00022RJB, 2023 WL 4203261, at *7 (D. Alaska June 27, 2023) ("Silencers are firearms accessories and not 'arms' for purposes of Second Amendment [p]rotection."); *United States v. Villalobos*, No. 19-cr-00040, 2023 WL 3044770, at *12 (D. Idaho Apr. 21, 2023) ("[T]he Court agrees with the Ninth and Tenth Circuit and holds silencers are not bearable arms within the meaning of the Second Amendment and are not constitutionally protected."); *United States v. Saleem*, 659 F. Supp. 3d 683 (W.D.N.C. 2023) ("[S]ilencers are not 'bearable arms' within the meaning of the Second Amendment."); *Hasson*, 2019 WL 4573424, at *4 (concluding that silencer is firearm accessory and not "bearable arm" under Second Amendment); *United States v. Perkins*, No. 08CR3064, 2008 WL 4372821, at *4

(D. Neb. Sept. 23, 2008) ("[S]ilencers/suppressors 'are not in common use by law-abiding

citizens for lawful purposes and therefore fall within the category of dangerous and unusual

weapons that the government can prohibit for individual use.'" (quoting *Fincher*, 538 F.3d at

874)); *see also Firearms Regul. Accountability Coal., Inc. v. Garland*, No. 23-cv-024, 2023 WL

5942365, at *5 (D.N.D. Sept. 12, 2023) ("[F]ederal courts have held that a silencer is not a

firearm on its own but rather a firearm accessory. As a result, a silencer is not a bearable arm

protected by the Second Amendment. Similarly, a stabilizing brace, like a silencer, cannot cause

harm on its own and is not a bearable arm which would implicate Second Amendment

protections." (internal citation omitted)).[16]

---

[16]     There is a recent decision in which the out-of-circuit district court declined to address the
Government's argument that silencers did not constitute bearable "Arms" under the Second
Amendment because it concluded that silencers lacked Second Amendment protection insofar as
they "qualif[ied] as 'dangerous and unusual weapons' based on their historical use and function.
*United States v. Comeaux*, Crim. No. 23-CR-00183, 2024 WL 115929, at *2 (W.D. La. Jan. 10,
2024). Yet, the district court expressed doubt that silencers were not bearable "Arms" under the
Second Amendment:

> Although th[e] rationale [for arguing that silencers are not "Arms" protected
> by the Second Amendment] is certainly defensible, it fails to address three
> important facts. First, silencers have been statutorily defined as "firearms" since
> 1934 and for the past 90 years have been included by federal law in the exact same
> broad category of "weapons" as machineguns and sawed-off shotguns. *United
> States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517, 112 S. Ct. 2102 (1992)
> (plurality opinion). Second, once incorporated into a firearm, the firearm silencer
> significantly alters an important and defining characteristic of that firearm by
> greatly lessening the noise emitted when discharged. And third, firearm silencers
> have absolutely no function if not attached to the end of a firearm to reduce the
> noise emitted when the firearm is discharged. If the Court were to determine that
> firearm silencers are not "arms" and therefore not protected by the Second
> Amendment, its decision would essentially cabin the Second Amendment's
> protection to only those discrete components of firearms that are functionally
> necessary to expel a bullet "through the energy of an explosive." 26 U.S.C. §
> 5845(a). Presumably, this rationale could exclude grips, sights, stocks, and other
> parts of a firearm from Second Amendment protection. Here, the Court need not
> decide to so limit the scope of the Second Amendment's protections.

*Id.* at 2 n.1.

To the extent that any of these courts have expounded the rationale for this determination, it is similar to the following:

> [A] silencer is not an "arm" or a "weapon" because it is not inherently useful "in case of confrontation" as a "[w]eapon of offence" or an "armour of defence." A silencer is not itself used "to cast at or strike another," it does not contain, feed, or project ammunition, and it does not serve any intrinsic self-defense purpose. . . . A silencer is not a weapon in and of itself, but simply a "firearm accessory," and therefore not a "bearable arm" protected by the Second Amendment.
>
> . . .
>
> [T]here is no evidence that silencers are "so critical" to firearm ownership that firearms cannot be used effectively without them. Although silencers may improve the usage of a firearm, they are not necessary, and they are therefore not protected by the Second Amendment. . . . Although ammunition is the means by which firearms are effective at serving their purpose as weapons and restrictions on type and usage may run afoul of the Second Amendment, the same cannot be said for silencers because a firearm remains an effective weapon without a silencer of any type attached.

*Hasson*, 2019 WL 4573424, at *4–5.

As shown above, courts are drawing a line for Second Amendment protection based on whether the particular firearm component is necessary or integral to a firearm's operation. If the component is necessary or integral, such as ammunition, it qualifies as a bearable "Arm" under the plain text of the Second Amendment. *See Miller*, 307 U.S. at 180 ("The possession of arms also implied the possession of ammunition, and the authorities paid quite as much attention to the latter as to the former." (quoting Herbert L. Osgood, *The American Colonies in the Seventeenth Century, Vol. 1*, ch. XIII)); *Capen*, 2023 WL 8851005, at *17 ("There is no question that because some kinds of firearms are constitutionally protected, the components and accessories of protected firearms that are integral to their function must also be protected."); *New York State Firearms Ass'n v. Nigrelli*, No. 23-CV-6524, 2023 WL 8495198, at *2 (W.D.N.Y. Sept. 21, 2023) ("[B]ecause arms lose their deadly force without ammunition, courts have consistently

held that ammunition is protected by the Second Amendment. The protection that ammunition enjoys under the Second Amendment is derivative of the right to bear arms. Therefore, reviewing courts do not distinguish between laws impacting access to ammunition from laws restricting access to arms themselves." (internal citations omitted)); *Nat'l Ass'n for Gun Rts. v. Lamont*, Civ. No. 22-1118, 2023 WL 4975979, at *19 (D. Conn. Aug. 3, 2023) ("Components of firearms that are necessary to their operation, such as ammunition, are covered by the Second Amendment.").[17] If the firearm component is not necessary or integral to the operation of a firearm, it does not fall within the Second Amendment's plain text. *See Cooperman*, 2023 WL 4762710, at *1 ("The plain text of the Second Amendment does not protect accessories that are not bearable arms[.]").

If this Court draws the same line as the other federal courts, irrespective of their conclusions, silencers would not constitute bearable "Arms" under the Second Amendment because they are neither necessary nor integral to a firearm's operation. In this regard, silencers are distinguishable from other firearm components such as "[c]leaning equipment, bullets, and materials that provide a firearm with protection from the elements" because they

---

[17]     As for magazines, they constitute protectable "arms" under the Second Amendment. *See Ass'n of N.J. Rifle and Pistol Clubs, Inc. v. Atty. Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) ("*ANJRPC*") ("[T]he question is whether a magazine is an arm under the Second Amendment. The answer is yes. A magazine is a device that holds cartridges or ammunition. Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." (internal citations omitted)), *abrogated on other grounds by*, *Bruen*, 597 U.S. at 19 n.4. In recent years, courts have reached conflicting decisions as to whether large-capacity magazines ("LCMs") receive similar protection. *Compare Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety and Homeland Sec.*, 664 F. Supp. 3d 584, 596 (D. Del. 2023) ("Magazines are arms, and so are LCMs."), *and Lamont*, 2023 WL 4975979, at *19 (concluding that LCMs are bearable "'arms' for purposes of the Second Amendment as defined in *Bruen* and *Heller*"), *with Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 388 (D.R.I. 2022) (concluding that plaintiffs seeking preliminary injunction "failed to meet their burden of establishing that LCMs are 'Arms' within the textual meaning of the Second Amendment").

are all necessary to render a firearm functional, whereas silencers serve no such core purpose. Without proper cleaning and repair equipment, protective materials, and ammunition, a firearm is nothing more than a paper weight and is no more of a bearable arm than a baseball bat. These accoutrements are thus critical to the use and effectiveness of a firearm as a bearable weapon, allowing them to serve their purpose as weapons of self defense such that restrictions may run afoul of the Second Amendment. *See Hasson*, 2019 WL 4573424, at *5 (citing *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (holding firing ranges are constitutionally protected); *Ass'n of N.J. Rifle & Pistol Clubs v. A.G. N.J.*, 910 F.3d 106 (3d Cir. 2018) (holding ammunition as a category is protected); *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014) (same)). These accessories are protected because without them, firearms would be neither useful nor functional. Instead, they would fall into disrepair and inoperability, precluding their protected use for self-defense. However, the same cannot be said of a silencer; "a firearm remains an effective weapon without a silencer of any type attached." *Id.* The use of a silencer is in no way necessary to the effective use of a firearm—it certainly has benefits for the user, but unlike cleaning materials or bullets, a firearm can be used safely and effectively without a silencer.

*Saleem*, 659 F. Supp. 3d at 697–98.

Although silencers appear to be unnecessary to the operation of a firearm, the defendants contend that silencers are "***necessary*** to the use of firearms insofar as they . . . prevent long-term hearing damage, . . . improve accuracy by reducing recoil and muzzle rise, and . . . can reduce hearing loss and disorientation immediately after firing, thereby providing one acting in self-defense additional time to defend against an attack." JP's Reply at 9 (footnotes omitted). Adopting the defendants' interpretation of the term "necessary" would require the Court to redefine it from referring to something that is "essential," *Necessary*, Black's Law Dictionary (11th ed. 2019), to instead refer to something that is akin to "helpful," "useful," or "advantageous." The Court declines to adopt such a tortured interpretation of "necessary."[18]

---

[18]    To an extent, it is understandable why the defendants would employ such an interpretation of "necessary." They have not, and seemingly cannot, argue that a silencer is essential to the operation of a firearm. *See Capen*, 2023 WL 8851005, at *17 ("[S]ome accessories, such as silencers, do not affect the essential operation of a weapon . . . ."); *Hasson*, 2019 WL 4573424, at *5 ("Here, there is no evidence that silencers are 'so critical' to firearm ownership that firearms cannot be used effectively without them. Although silencers may

Overall, if there is a line of demarcation between firearm components entitled to Second

Amendment protection as bearable "Arms," determining which components are necessary to the

operation of the firearm appears to constitute a reasonable limitation on the scope of the Second

Amendment. *See Heller*, 554 U.S. at 626 ("[T]he right secured by the Second Amendment is not

unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely

explained that the right was not a right to keep and carry any weapon whatsoever in any manner

whatsoever and for whatever purpose."). Otherwise, the Second Amendment covers all

components of firearms, such as grips, stocks, optics, extended or special magazines, and barrel

attachments.[19] Although the Supreme Court has yet to squarely address the extent of the Second

Amendment's protection of firearm components, the Third Circuit has determined that

magazines qualify as bearable "Arms" under the Second Amendment because they "feed

---

improve the usage of a firearm, they are not necessary, and they are therefore not protected by
the Second Amendment.").

[19]     The *Bruen* Court explained that the "general definition" of "Arms" "covers modern
instruments that ***facilitate*** armed self-defense." 597 U.S. at 28 (emphasis added) (citing *Caetano*,
577 U.S. at 411–12). To "facilitate" means "[t]o make the occurrence of (something) easier; to
render less difficult." *Facilitate*, Black's Law Dictionary (11th ed. 2019). If the question of
whether a firearm component qualifies as a bearable "Arm" under the Second Amendment
depends on whether the component makes armed self defense easier, it would seemingly open
the door to significantly broader Second Amendment protections for firearm components.

     Although there was no evidence presented on the Motion to Dismiss as to the use of
silencers, if the defendants' arguments about the necessity of silencers were supported by
evidence it could lead to a conclusion that silencers make self-defense easier because they
improve accuracy and reduce hearing loss and disorientation immediately after firing. *See* JP's
Reply at 9. On the other hand, it is possible that silencers would not make self-defense easier.
*See United States v. Beaty*, No. 22-cr-95, at 19–20 (M.D. Fla. Jan. 20, 2023) (order denying
motion to dismiss indictment) ("The hypothetical utility of a firearm silencer does not transform
a silencer into a bearable arm. By comparison a magazine facilitates self-defense because a
firearm requires rounds. But the application of Second Amendment protections should not turn
on the ability to conjure fanciful arguments on how firearm accessories facilitate armed self-
defense. One could easily craft a counter-argument: silencers render weapons more unwieldy,
more difficult to conceal, and minimize the noise which frightens and thus disorients the notional
assailant.").

ammunition into certain guns, and ammunition is ***necessary*** for such a gun to function as intended." *ANJRPC* at 116 (emphasis added). After analyzing the necessity of the defendants' silencers to the operation of a firearm, the Court joins the other federal courts to have squarely addressed whether silencers are "Arms" under the Second Amendment in concluding a silencer is not a bearable "Arm" under the Second Amendment because it is merely an accessory which is unnecessary to the essential operation of a firearm.[20]

---

[20]     The Court also briefly addresses two of the defendants' other arguments. The first is the defendants' contention that a silencer is a bearable "Arm" because Congress includes it under the definition of a "firearm" in the NFA and GCA. This argument is unavailing because courts should not simply follow the legislature's label of something (or someone) for Second Amendment purposes. *See Range*, 69 F.4th at 102–03 (rejecting Government's argument that "the Second Amendment devolves authority to legislators to decide whom to exclude from 'the people' . . . because such 'extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label.'" (quoting *Folajtar v. Atty. Gen. of the U.S.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting))); *see also United States v. Coleman*, Crim. No. 22cr87, 2023 WL 6690935, at *11 (E.D. Va. Oct. 12, 2023) (rejecting Government's contention that determination of whether individual was part of "the people" protected by Second Amendment should be vested with legislatures because "hold[ing] otherwise would permit Congress and state legislatures to de facto amend the Constitution themselves, thus circumventing the Constitution's amendment process by legislative fiat. Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections." (citations and internal quotation marks omitted)); *Jones v. DeSantis*, 410 F. Supp. 3d 1284, 1306 (N.D. Fla. 2019) ("As the Supreme Court has made clear time and again, whether an exaction is a 'tax' for constitutional purposes is determined using a 'functional approach,' not simply by consulting the label given the exaction by the legislature that imposed it." (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564–66 (2012))), *aff'd sub nom. Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020). Thus, items do not qualify as an "Arm" under the Second Amendment merely because Congress or a state legislature defines them as "firearms" in statute.

       The second argument is that silencers are in common use for self-defense as evidenced by the over 2.5 million silencers legally owned in the United States as of 2021. The Court will not address this issue based on the conclusion that silencers are not bearable "Arms." Nonetheless, despite this ownership statistic, no evidence was presented that silencers are commonly used today for self-defense. *See Beaty*, No. 22-cr-95, at 20 ("[T]he mere fact that a great number of silencers are registered with the ATF does not mean they are employed for self-defense."). In addition, to the extent the defendants are comparing over 2.5 million silencers with the hundreds of thousands of stun guns which caused Justice Alito to conclude, at least in part, that "stun guns are widely used and accepted as a legitimate means of self-defense across the county," *Caetano*, 577 U.S. at 420 (Alito, J., concurring), the Court is unsure of the relevance of the number of lawfully owned stun guns when compared to the number of lawfully owned silencers because

III.   **CONCLUSION**

The defendants have failed to show that machineguns or silencers are protected "Arms" under the Second Amendment. The Second Amendment does not protect machineguns because they are not in common use today for self-defense. As for silencers, since they are unnecessary to the essential operation of a firearm, they are not bearable "Arms" covered by the Second Amendment. Accordingly, the Motion to Dismiss Indictment is denied.

BY THE COURT:

/s/ Joseph F. Leeson, Jr.
JOSEPH F. LEESON, JR.
United States District Judge

---

stun guns appear to have no lawful purpose other than serving as a means of self-defense. There is no indication that the same may be said about silencers.